**GIOVINALE, Plaintiff-Appellant, v REPUBLIC STEEL CORP., et, Defendants-Appellees.**

Ohio Appeals, Eighth District, Cuyahoga County.

No. 20676.  Decided April 12, 1948.

Paul Mancino, Cleveland, for plaintiff-appellant.

McKeehan, Merrick, Arter & Stewart, Cleveland, Orgill, Maschke, Wickham & Loux, Cleveland, for defendants-appellees.

## OPINION

By HURD, PJ.

This action in tort for personal injuries, is here on appeal from a judgment of common pleas court wherein at the close of plaintiff's case a verdict was directed for defendants on the ground that plaintiff was guilty of contributory negligence as a matter of law. The parties stand in the same relation as in common pleas court and will be designated accordingly.

The principal assignment of error is:

"That the judgment of the court in directing a verdict for the defendants and entering judgment for the defendants was contrary to law and the evidence."

Plaintiff was one of two laborers who among others were in the employ of The Hunkin-Conkey Construction Company, the general contractor for the building of the Defense Plant Corporation Plant No. 4 at The Republic Steel Corporation.

Early in the morning of Feb. 21, 1944, about 7 o'clock as appears by the record, plaintiff and Tony DiRubbio, a fellow employee of The Hunkin-Conkey Construction Company were sent by their foreman to work with two plumbers and other employees of defendant The Schweizer Dipple Company, an independent sub-contractor of the general contractor, and were instructed to follow the orders of said employees who "picked them up in a truck and took them to work on the premises of defendant, The Republic Steel Corporation. They were first put to work digging a trench for a pipe underneath a bridge and continued thereat until about 3 P. M. when they were then taken by the employees of the defendant The Schweizer-Dipple Company to the place where an accident occurred which forms the basis for this lawsuit.

Concerning this, the parties stipulated "that on Feb. 21, 1944 a call came to the Schweizer-Dipple Co., to repair a steam line and the Schweizer-Dipple Co., proceeded to repair the steam line with their men." The parties also stipulated that "the work sheet introduced as plaintiff's Exhibit C and C-1, is the work sheet of the plumbers (Schweizer-Dipple Co) for repairing the steam line on Feb. 21, 1944." The pertinent part of said work sheet is as follows:

"Repair leak in Desuperheating hot water line at gate house * * *

| | | |
|---|---|---|
| 1 plumber foreman | 4 | 6 |
| 1 plumber | 4 | 6 |
| 1 Welder | 4 | 6 |
| Total hours | 71 | 18 ... 89 |

\* \* \* leak in Desuperheating Hot Water Line was found to be caused by a large piece of half round iron 4 inches thick that was thrown in on the pipe in back filling . . . ."

It will be noted from this work sheet that defendant Schweizer-Dipple Company used three of their, employees, one of whom was a plumber foreman, one a plumber and another a welder.

We think it a reasonable inference to be deduced from this exhibit and the entire record, in the absence of evidence to the contrary, that the plumber foreman exercised control over plaintiff and his fellow workman as hereafter appears in connection with the repair work then under way.

With relation to the accident the plaintiff testified as follows:

"Q. Now when these plumbers took you to another place how did they take you over there?

A. With the truck.

Q. And did anybody go with you?

A. I and Tony and the plumber.

Q. And where did this plumber take you?

A. They took me near the hospital, the new hospital they were building.

Q. And when you got there what did the plumber do and what did you do?

A. They made me get off the truck.

Q. And after you got off the truck what did they do and what did they tell you, if anything?

A. They made me take the pick and shovel from the truck.

Q. What did they tell you to do then, if anything?

A. They asked me to dig at the place where they took me.

Q. Who showed you where to dig?

A. The plumber.

Q. And what did he tell you when he showed you where to dig?

A. Well, they told me to dig here and I started digging there.

Q. When you got there at the place where they told you to dig was there anything on top of the ground, or anything?

A. There was an inch or two inch of water some place and some place not.

Q. Did you start digging then?

A. Yes sir.

Q. And what happened after you started to dig?

A. I dig about a foot or foot and a half.

Q. And what happened then?

A. I went to push the shovel down in the hole and my foot went down and the steam starting coming up.

Q. And how far in the hole did your leg go?

A. It was up to here (indicating).

Q. Indicating his thigh, the upper part of his thigh. And what did you have on your feet at that time?

A. I had working shoes and the galoshes on top of them.

Q. What happened to your leg when it went into this hole?

A. I went down and the steam started coming up and I don't remember anything any more."

Tony Derubbio, the fellow-workman of plaintiff, testified in substance that at the place where they were instructed to work in the afternoon by the plumbers, he worked beside the plaintiff; that he saw some steam coming out of the ground and requested the plumbers to shut off the steam and was told by them that the two men should continue to dig as there was something wrong with the valve and that they were unable to shut off the steam. Concerning this Tony Rebubbio testified in part as follows:

"Q. Tony when you got over to this place tell the court and jury what happened over there.

A. Well, just what happened, both plumbers tell us we should go dig and we started to digging * * * I told Tony 'I don't know what we are going to do in this digging or not.' The plumber say we got to try to dig. I say, 'why don't they turn off the water line or steam line?' They said they can't shut off because something is wrong with valve. * * *."

Another witness, Patsy DeSchanza, was a witness for plaintiff and testified in substance that he was a foreman of The Hunkin-Conkey Construction Co. and that he was called to the place of the accident some time after 3 o'clock P. M. and that he and his men went to work in the same place where plaintiff was injured; that he and his men dug at the place where plaintiff had started to dig in order to find the leak; that they set a pump in the hole in order to pump out the water and the steam; that after they dug a hole they shut off the steam and that the steam continued to come up out of the ground until 7 P. M. that night and that they continued to work until 10:30 P. M.; that they finally found the leak underneath a big rock which had cracked the pipe.

Considering the foregoing, together with the entire record, the trial court was presented with the question of whether reasonable minds might reasonably reach different conclusions

upon the ultimate issues of fact presented by the evidence. For the purposes of the motion plaintiff was entitled to have his testimony accepted as true and all the evidence construed most strongly in his favor. Upon such a motion the court is not permitted to weigh the evidence and the test in such a case is not whether the trial court would set aside a verdict on the weight of the evidence.[1]

The facts presented by the record involve not only the question of the negligence of the respective parties but also the question of the proximate cause of the injuries and the elements of responsibility and foreseeability. What duty was owed by defendants to plaintiff and what duty devolved upon plaintiff to exercise care for his own safety? Such questions are usually for the determination of the jury.

Before the plaintiff could be held to be guilty of contributory negligence as a matter of law as distinguished from a question of fact, it would have to be shown conclusively by the evidence that reasonable minds could arrive at only one conclusion and that adverse to the plaintiff on all essential questions of fact. It would also have to be shown that the accident and resulting injuries were due to the sole negligence of plaintiff or that his negligence contributed to the negligence of defendants. But this alone would not be sufficient. To warrant a conclusion adverse to plaintiff as a matter of law, it would have to appear further by the evidence that plaintiff's injuries were the natural and probable consequence of plaintiff's negligence and that it was such as might or ought to have been foreseen by him in the light of attending circumstances.

As we view the case, the jury could well consider whether or not defendant, The Schweizer-Dipple Company, presumably skilled in the work of installing and repairing steam lines, could reasonably have foreseen or anticipated the danger of instructing these laborers, presumably unskilled, to proceed to dig in such a place under such circumstances and whether or not the negligence of said defendant was a proximate cause of plaintiff's injuries, and whether or not the defendant was charged with the duty toward plaintiff of responsibility and foreseeability under all of the circumstances then and there existing.[2]

Counsel have called to our attention the recent case of **Winkler, appellee v City of Columbus, appellant, 149 Oh St 39,** decided Jan. 28, 1948 wherein the supreme court reversed the court of appeals of Franklin County and affirmed the judgment

1. See: *Hampton Lodge v Ohio Fuel Gas Co. 127 Oh St 649,* particularly, Syllabi 3 and 4.

2. See *29 O. Jur. 483,* Parag. 68 et sequi.

of the common pleas court sustaining a motion to direct a verdict on the ground that plaintiff therein was contributorily negligent as a matter of law. We think that case is clearly distinguishable on the law and facts from the instant case. That case was a sidewalk case and plaintiff by her own admission in broad daylight saw the defective condition of the sidewalk but nevertheless entered upon it and was injured. The facts of the instant case are not analogous. There are no admissions of negligence by plaintiff in this case. Furthermore, plaintiff here was not a free agent walking on a sidewalk in broad daylight. He was a workman under orders, performing a difficult job under difficult conditions. We think it is a matter of common knowledge that workmen doing manual labor occasionally, if not frequently, confronted with similar situations.

Nevertheless, when they are ordered by persons temporarily placed in authority over them to proceed, they may feel that they do not have a choice of refusal if they wish to keep their jobs. Can the one who has assumed authority then avoid responsibility by claiming as a matter of law that it was the injured person's own fault because he followed such orders? We think not.

In the case of **The Painesville Utopia Theater Co. v Lautermilch 118 Oh St 167** where the question of contributory negligence as a matter of law was involved in an accident to a theater patron, the supreme court held:

"Whenever, from conflicting evidence of the same witness or of different witnesses, it becomes necessary to weigh such conflicting evidence to determine wherein the probable truth lies, or from a combination of circumstances determine an ultimate fact upon the determination of which different minds might reasonably arrive at different conclusions, it is the province of the jury to perform that function. It is reversible error for the court to invade that province of the jury." (syllabus)

In the case of **Childe v Cinn. St. Ry Co. 80 Oh Ap 128**, decided Feb. 17, 1947, which also involved the proposition of contributory negligence as a matter of law, the Court of Appeals of Hamilton County relied upon the case of Theater Co. v Lautermilch supra, and held as follows:

"Whenever in the trial of an action it becomes necessary to determine between conflicting statements of the same or different witnesses wherein the truth most probably lies, or from all the circumstances determine an ultimate fact upon

the determination of which different minds might reasonably arrive at different conclusions, or where it is doubtful whether reasonable minds would or would not draw different inferences from such evidence, the question is for the jury and it is error for the trial court to direct a verdict or grant a motion for judgment for the defendant." (syllabus 2)

So, in the instant case, we conclude from all the facts and circumstances disclosed by the evidence, that questions of fact were presented upon which reasonable minds might reasonably arrive at different conclusions or might reasonably draw different inferences and that therefore, the question of the alleged contributory negligence of the plaintiff was not a question of law for the court but a question of fact for the jury to be determined under proper instructions of the court.

The defendant, Schweizer-Dipple Company, by way of brief states that the trial court based its action in sustaining the motion for a directed verdict in favor of defendants solely upon the proposition of contributory negligence or assumed negligence on the part of plaintiff, but urges in this court a further ground for the action of the trial court in directing a verdict for defendants. This is based upon the assertion that there was "no responsibility on the part of the Schweizer-Dipple Co., for the making of excavations, the manner of making same, the direction and control of the men making the excavations or any responsibility whatsoever in relation to making them." It is urged that the sole responsibility in that regard was upon The Hunkin-Conkey Construction Company. In substantiation of this contention there is quoted the following from part 3 of Mutual Ex. 1:

"All work in connection with excavation and back fill for underground pipes will be performed by others."

There is evidence in this record tending to show that the work here in question was a repair job which was under the exclusive control of The Schweizer-Dipple Company as an independent sub-contractor. There is also evidence tending to show by way of reasonable inference that defendant, The Schweizer-Dipple Co., through its plumbers, one of whom was a foreman, assumed exclusive control over the plaintiff at the time of the accident and required him to work in a place which was dangerous and failed to shut off the steam or to take other precautions which would assure that the work was performed in a safe manner. The facts indicate that after the accident, means were found to obviate the danger by pumping the excess water and escaping steam out of the hole and by shutting off the steam line at the control valve.

It seems to us that applying the same principles of law hereinbefore cited and quoted it became a question of fact for determination of the jury as to whether or not under the circumstances the defendant The Schweizer Dipple Company in its capacity of an independent sub-contractor, assumed and exercised control over these men; as to whether or not they instructed them to dig in this place which was dangerous, as to whether or not such danger was, in the exercise of ordinary care reasonably foreseeable and as to whether or not under such circumstances defendants were negligent and whether such negligence was the proximate cause of the resulting injuries. These are matters, it seems to us, upon which reasonable minds could reasonably reach different conclusions. Again these were questions of fact for the determination of the jury under proper instructions from the court.

With respect to defendant, The Republic Steel Corporation, an entirely different factual situation is presented by the record. While it was stipulated that said defendant had possession and control of the plant at the time of the accident, there is no evidence in the record tending to show that said defendant had control over plaintiff or had anything to do with the work itself. There is nothing in the record to show that The Republic Steel Corporation created or permitted an existing hidden danger nor does the record show that said defendant had any knowledge that the plaintiff was required to work at the place where this accident happened, nor is there anything in the record to show that said defendant interfered with the manner of doing the work or assumed or exercised any control or directions over plaintiff on this particular repair job. In short, from a perusal of the entire record, we have concluded under principles of applicable law, that there is no evidence in this record tending to show that said defendant failed to exercise the duty of ordinary care toward the plaintiff.

Entertaining these views, the judgment of the common pleas court will be affirmed as to the defendant The Republic Steel Corporation, and reversed as to the defendant, The Schweizer-Dipple Company, and the cause is remanded for further proceedings according to law. Exceptions noted. Order See Journal.

MORGAN, J, concurs. SKEEL, J, dissents.

### DISSENTING OPINION

SKEEL, J, (dissenting).

The Defense Plant Corporation, some time prior to November 10, 1942, entered into a contract with The Republic

Steel Corporation authorizing The Republic Steel Corporation to act as its agent in the construction and operation of certain steel plants in the City of Cleveland. The Republic Steel Corporation, in carrying out its obligations under such authority, entered into a contract with The Hunkin-Conkey Construction Company as a general and independent contractor for the construction of such plant. In furtherance of its duties as a general contractor, The Hunkin-Conkey Construction Company entered into a contract with The Schweizer-Dipple Company as an independent sub-contractor of The Hunkin-Conkey Construction Company to do certain plumbing and steamfitting work for the installation of water, steam, gas and air piping. The contract between The Hunkin-Conkey Construction Company and The Schweizer-Dipple Company specifically provided:

"All work in connection with excavation and backfill for underground pipe will be furnished by others * * *."

The plaintiff was a laborer employed by The Hunkin-Conkey Construction Company. On Feb 21, 1944, he was sent by his foreman, together with another laborer, with two plumbers, employees of Schweizer-Dipple Company, to dig a ditch in which the plumbers were to install a pipe line. About three o'clock of that day word was sent to these workmen to go to another part of the plant where an underground steam pipe had broken. The plumbers took the plaintiff and his fellow laborer to the location of the broken steam pipe for the purpose of having them do whatever excavating found to be necessary to enable the plumbers to repair the break. When they arrived at the place of the break, the plumbers directed the laborers to dig where steam was coming out of the ground and the ground was covered with water.

The uncontradicated evidence as to who the plaintiff's employer was and who directed him to do the work which he was doing at the time of the sustained injury is as follows: (A Mr. Tagliaferri was Superintendent and Anthony DeShance was plaintiff's foreman) DeShance testified as follows (in part):

"Q. Did you have Tony Giovanale over here as one of your men?
A. Yes, I did.
Q. What instructions did you have from your foreman as to placing these laborers on that particular job if any?
  *     *     *     *     *
Q. From your superintendent I mean?

A. The superintendent gave the orders. * * *

Q. Your superintendent was Tagliaferri, wasn't he?

A. Yes.

\* \* \* \* \*

Q. Was Schweizer-Dipple one of the sub-contractors on that particular job?

A. Yes.

Q. And what instructions did you have relative to supplying them with any laborers?

\* \* \* \* \*

A. The only instructions I had was that any time men was needed after the superintendent gave me orders I'd give out the men otherwise I wouldn't give out any men unless the superintendent O. K'd it first.

\* \* \* \* \*

Q. On Feb. 21, 1944 did you have any conversation with any Schweizer-Dipple men?

A. Well, I don't know what you mean by that now, conversation.

Q. The plumbers, did they talk to you on that particular date?

A. Well, I don't know what you mean by that question, talking. There's always talking going around on the work.

Q. I am talking about the Schweizer-Dipple men, did they talk to you about furnishing them with any men or anything else?

A. Yes.

Q. What was said and done?

A. He come up to me and asked me for two laborers.

Q. What time of the day was it when he asked you for two laborers?

A. If I recall it right, I think it was the first thing in the morning—around 8:00 o'clock.

\* \* \* \* \*

Q. Who were these two men, do you know?

A. One is that man sitting there at the desk.

Q. Who is that, where, what desk?

A. Right here (indicating).

Q. You mean Giovanale here?

A. Yes.

Q. He isn't a Schweizer-Dipple man, is he?

A. No, he was my man.

Q. Who were the Schweizer-Dipple men?

A. Well, I don't see them in the room here. I only know them by the name of Joe.

Q. Who did they ask you? What did they say?

A. He wanted two laborers.

Q. ˚And what happened then, what did you do?

A. I told him I'd have to find out first˚whether I was permitted to give him the two laborers.

Q. What did you do then?

A. After I found out it was O. K. I give it to them.

Q. What did the Schweizer-Dipple men do with the laborers?

A. After it was O. K. he took them away. Where he took them I don't know."

The superintendent, testifying for plaintiff as follows:

Q. "Mr. Tagliaferri, what part of the work did the Hunkin-Conkey Co have out there?

A. We had the general contract, that is, we were the prime contractor, that is what we were, and we had several sub-contractors like Dingle-Clark on the plumbing·and heating and the electrical work was done by another contractor and so forth.

Q. What work did the Schweizer-Dipple Co do out there?

A. The Schweizer-Dipple Co they done all the plumbing and the steam job and gas work.

Q. Were they doing that work in February of 1944?

A. Well, yes, they were still on the job.

Q. And what if anything, did they do in regard to any excavating or digging that had to be done out there?

Mr. Van Lill: I object.

The Court: The objection is overruled.

Q. Well—that—it was that we done all the excavating, all the digging was done by us. In other words the Schweizer-Dipple Co didn't have only mechanical, whereby we had practically all the rest of the trades, bricklayers, carpenters and iron workers, and so forth.

&ast;  &ast;  &ast;  &ast;  &ast;

Q. In regard to doing the work out there by the Schweizer-Dipple Co did they do any of the excavating or digging in order to lay any pipes or repair any pipes?

A. No, sir.

Q. Who did that?

A. We done that.

&ast;  &ast;  &ast;  &ast;  &ast;

Q. In regard to Anthony DeShance in particular, what instructions had you given. him, if any, relative to supplying any labor for the Schweizer-Dipple Co?

A. Well that was a standing order.

Q. Well, what was it?

364

A. That is, if any of the plumbing contractors required any men which as I stated before, we done all the digging, it was up to us to furnish the men to do the work.

\* \* \* \* \*

Q. You were the labor superintendent of all the men there employed by the Hunkin-Conkey Construction Company?

A. Correct.

Q. And the Hunkin-Conkey Construction Company had complete control and supervision of the men who were doing the work?

A. That's right.

Q. Then, as I understand it, you had labor foremen, such as DeShance who worked under you as labor superintendent?

A. That's right.

\* \* \* \* \*

A. He was supposed to watch his own men.

Q. That's right. And his men, his laborers, took orders from him, is that right?

A. They were supposed to, yes.

Q. That was the general scheme?

A. That's right.

Q. He had no authority to conduct your business in any other way, did he?

A. Not from me, no."

\* \* \* \* \*

The plaintiff's fellow workman testified in part:

Q. "On the morning of Feb. 21, 1944, will you tell the court and the jury where you were working and where Tony Giovinale was working?

A. Well, that morning we come in to work 7:00 o'clock and soon we come in Tony DeShance, our boss, foreman, told me and Tony together to go to the plumber on the other plant where call it coke plant I think it was.

Q. Did you and Tony Giovanale go with the plumber?

A. Yes, sir.

Q. Who took you over there?

A. The plumber.

Q. How did they take you over there?

A. On a little truck, about half-ton truck.

Q. To what place did you go there in the morning?

A. I think they had some pipe line, if I don't am mistake, 12 inch pipe line to cut.

Q. And so you went with the plumbers over there, is that right?

A. Yes.

Q. When you got there what did you do?

A. Well, we digging that pipe line there: it's supposed to be cut and connected with some other line.

Q. Who told you to dig?

A. The plumber.

Q. How many plumbers were there at that time?

A. I think there was two, two or three, was two sure.

Q. Then you dug at that place how long?

A. We stay there I think around three o'clock.

Q. And at 3:00 o'clock what happened?

A. What happened, I suppose—

Q. Talk a little slower, because she has got to write down what you say. You say about 3 o'clock?

A. Yes.

Q. You went to another place?

A. Yes.

Q. Who took you over to this other place?

A. The plumber.

Q. How did they take you there?

A. On a little truck again.

Q. Where did they take you do you know?

A. We take it right there and we had leak, big leak there, they claim was busted pipe.

Q. When you got over there to this place where there was a leak in the pipe, you say, who was there?

A. Plumber.

Q. How many plumbers?

A. I think it was two.

Q. Two plumbers. Who else was there?

A. I didn't remember anybody else but plumber.

Q. Well, were you there?

A. Yes, I was there.

Q. Was Tony Giovinale there?

A. Yes.

Q. And this place where they took you about 3 o'clock, whereabouts was that?

A. Well, they call that new blast furnace.

Mr. Orgill: If the court please, we can't hear the witness. I think if counsel would stand back, we might get what he is saying.

Q. Where was this place they took you at 3 o'clock?

A. This was old place, new plant was building, blast furnace, where we been working.

Q. When you got there with the plumbers what did the plumbers do and what did you do and what did Tony Giovinale do?

A. The plumber didn't done anything, just sit around, told me and Tony we should digging and find that leak.

Q. Did the plumbers tell you where to dig?

A. Yes.

Q. Where did they tell you to dig?

A. They tell me and Tony we should dig and find the leak; was hot water come out and steam. We can't even see each other. I dig on one side and Tony dig on other side, only about four feet space, something like that.

Q. What was on the ground at that time?

A. What's that?

Q. What was on the ground where you were digging?

A. See the steam and water come out from under the ground.

Q. Was there any water on the ground?

A. Plenty water, just fishing dirt and water.

Q. When you started there, where was Tony working with reference to where you were working?

A. Working with me, just shoulder by shoulder.

Q. Shoulder by shoulder?

A. That's right.

Q. What happened as you started to work?

A. We start to dig in and the water just come out so fast we can't even see each other; the water just boiling.

Mr. VanLill: May I sit here? I don't undestand him.

Mr. Orgill: And may the witness be instructed to speak louder?

The Court: He speaks loud enough but he slurs some words. The stenographer cannot get him if he doesn't talk clearly. I can't understand some of the words.

Q. Tony, when you got over to this place tell the court and jury what happened over there.

A. Well, just what happened, both the plumbers tell us we should go dig and we start to digging. That's really, the water come up too fast up and steam and I told Tony, 'I don't know what we going to, do in this, digging or not.' The plumber say we got to try to dig. I say 'why don't they shut off the water line or steam line?' They said they can't shut off because something is wrong with the valve. I said, 'It's hard to digging here. It's so hot we can't even see each other.' Anyway we fish around and digging that water and dirt and steam come up all the time. Tony was just near that concrete pole and I was near. The water come up I think a tunnel. All at once I hear Tony hollering; he had one foot—the water just come up so fast and there's a little tunnel under there. I don't know, he don't know and he fall with one foot in. He

holler. We work shoulder by shoulder. I turned around and pulled him out and he fall on the ground and take his shoe off and stocking'off and we take him to the hospital.

\* \* \* \* \*

Q. When you first got to the point at which you were digging, there was already steam and water coming through wasn't there?

A. That's right.

Q. At the point at which you dug afterwards?

A. Yes.

Q. And then when you dug, more steam came up?

A. More steam come up.

Q. You spoke about cutting off the steam and the water, because you knew it would be dangerous to continue didn't you?

A. That's right.

Q. Did Tony say the same thing or not?

A. Same thing.

Q. He knew it would be dangerous?

Mr. Mancino: I object.

A. Tony don't say very much. He don't understand much English, or hear very much. I told Tony, 'I don't know what we can do.' He asked me what to do. I said, 'we were told to dig.' We can't dig very much. I said 'I told them to shut off the steam and they said they can't shut off because something is wrong with the valve.' We don't go so far about 12 inches, 18 inches and then the tunnel was just near the concrete pier there. I suppose that steam just go under the ground tunnel and Tony just fishing that dirt and hot water, come up and he fall just one foot just near the concrete.

Q. Go ahead, finish.

A. We working shoulder by shoulder. When I hear Tony hollering I turned around and grab Tony. One foot in the hole about 12 inch 18 inches deep.

The Court: Just a minute.

Mr. Van Lill: I didn't like to stop him.

The Court: What was the question.

(Question read)

Q. Did you? You knew it would be dangerous to work there with that steam and water?

A. Certainly.

Q. That is what you and Tony were talking about isn't it?

A. Yes, that's right.

Q. Did Tony tell you it would be dangerous or did you tell him?

A. Yes.

Q. Which?

A. I tell him mostly because he don't understand exactly what we should do.

Q. You told him, anyhow?

A. I told him, yes.

Q. In Italian.

A. Yes."

The plaintiff testified in brief that he was sent by his foreman with the plumbers, that the plumbers took him to the place where he was to work, in a truck and then showed him where to dig; that some time thereafter he was taken by the plumbers to the place where he was injured and when he got there they again told him where to dig.

"Q. When you got there at the place where they told you to dig was there anything on top of the ground or anything?

A. There was an inch or two of water some place and some place not.

Q. Did you start digging there?

A. I dig about a foot or foot and a half.

Q. And what happened then?

A. I went to push the shovel down in the hole and my foot went down and the steam started coming up."

Upon the conclusion of all plaintiff's evidence, upon motion the court entered judgment for both defendants and against the plaintiff. The plaintiff's assignments of error are as follows:

1. That the judgment of the court in directing a verdict for the defendants and entering judgment for the defendants was contrary to law and the evidence.

2. The court erred in directing a verdict for the defendants at the close of the plaintiff's testimony.

3. The court erred in not submitting the issues herein to the jury for their determination.

This court is unanimous in its conclusion that the court was correct in entering judgment for the defendant, The Republic Steel Corporation for the reason that there was no evidence which tended to establish any breach of duty owed to the plaintiff by such defendant which in any way was a proximate cause of plaintiff's injuries.

We come, therefore, to the question as to whether or not there were any issues of fact; taking the plaintiff's evidence

in its most favorable light, in support of his claims against the defendant, The Schweizer-Dipple Company.

It is contended by plaintiff that this defendant owed the plaintiff the duty to furnish him a reasonably safe place in which to work.

There are two answers to this contention. (1) This defendant was a sub-contractor of plaintiff's employer who was, in fact, the general contractor of the agent of the owner of the premises. There is not a word in this record which shows or tends to show that the defendant, Schweizer-Dipple Company, had any right of control over the physical conditions surrounding the place where the repair to the steam line had to be made. (2) The break of the steam line was of necessity, an emergency and the dangers surrounding its repair were as evident to the plaintiff and his employer as they were to the defendant, The Schweizer-Dipple Company, or its employees and such dangers were not such as could have been provided against.

The only basis for any liability of the defendant, The Schweizer-Dipple Company, to the plaintiff under the admitted circumstances of this case, must be founded upon the theory of respondeat superior. But the facts negative any such relationship. The work the plaintiff was doing was that of his employer, The Hunkin-Conkey Construction Co. The only possible part that The Schweizer-Dipple Company had to do with regard to the plaintiff and his work was to show him where to dig. This was because such work was a necessary prerequisite of the work to be done by the subcontractor as provided by the contract. There can be no legal responsibility against a sub-contractor where the only ground relied on is that the employees of such sub-contractor directed the workman of a general contractor where the work of such general contractor was to be done to make possible the doing of the sub-contractor's work. Such acts do not establish any assumption of control of such general contractor's employees. If the general contractor failed in providing adequate supervision for the safety of its employees such failure cannot be charged to a subcontractor who is acting under the direction and control, and under the terms and scope of its contract with the general contractor. Under the admitted facts of this case The Schweizer-Dipple Company had no right or duty to supervise or direct the manner or means by which employees of the general contractor, The Hunkin-Conkey Construction Company carried on their work and any attempt on the part of an employee of The Schweizer-Dipple Company to do so would be outside the scope of his employment and could not impose a liability upon his employer.

The rule to be applied under these circumstances is the same as that defining the responsibility of a master to one injured by the negligents acts of his servant where such servant has been loaned or directed to work for another. Clark in his new work "Summary of American Law" Parag. 59 page 63, says:

"* * * Where the master lends or leases his servant to X and during the course of his work for X he injures the plaintiff, the master's liability depends on the nature of the arrangement between him and X as to who had control of the servant while he is performing X's work; if he is to obey X's directions as to the manner of performing the work, then the liability is on X; but if X's power to direct the servant is confined to showing him the work to be done, then the master is responsible."

In the case of Snyder Admrx. of the estate of H. S. Snyder, dec'd v The American Cigar Company, 22 O. C. C. Rep. (N. S.) 45, the plaintiff was seeking recovery for wrongful death. The decedent was a carpenter employed by a carpenter-contractor who had contracted with defendant to do certain work about its building. The plaintiff admitted that deceased was employed by Bloor (the carpenter contractor) but charges that at the time he started to work on the job, Bloor was only present a few hours, leaving the deceased thereafter in charge and with the defendant cigar company, supervising and controlling the conduct of the deceased and the mode and manner of doing the work, and that plaintiff's decedent followed the suggestions, directions and control thus made and exercised by the defendant."

On page 47 of the opinion the court said.

"It thus appears to have been the purpose of the pleader in drafting the plaintiff's petition and reply to set up the existence of the relation of master and servant between plaintiff's intestate and the defendant, and to count upon the rights and duties growing out of that relation; and it is indeed possible, under the decisions in this state, for one who is in the general employ of one person to become by a sort of adoption the employee also of another; the right of control being one at least of the tests applied to establish the existence of the relation of master and servant under these special circumstances. McCafferty v Dock Company, 11 C. C. 457."

Paragraph 3 of the syllabus provides:

"Where the plaintiff seeks to recover upon the theory that the relationship of master and servant existed, but fails to introduce any evidence which would make the defendant liable as an employer, it is of no moment that the defendant in his answer has made no reference to the relationship of master and servant."

In the case of Steinman v Penna. R. R. Co. et al, 54 Fed. (2d) 1052 the plaintiff was employed to build concrete piers for a railroad bridge, the contractor to furnish all labor, material and equipment. The railroad employed inspectors to see that the work was carried out as provided by the contract. During the progress of the work a railroad company inspector told an employee of the contractor to provide a scaffold at a certain place. The employee of the contractor said there was not sufficient lumber of the proper kind out of which to construct such a scaffold. He did, however, follow the inspector's instructions to build the scaffold with what lumber there was available. Another employee was injured when the scaffold broke. Paragraphs 3, 4, and 5 of the headnotes provide:

"3. That independent contractor's servant was sent by contractee's inspector to do certain work, did not make him contractee's servant pro hac vice.
4. Whether there is such assumption and change of masters as to create corresponding change of liability depends on whose work is being performed, usually answered by ascertaining who controls servants.
In this connection there must be a careful distinguishing between authoritative direction and control and mere suggestion as to details or necessary co-operation where work furnished is part of a larger undertaking.
5. Power of control remains in original master so long as he retains right to direct manner of work and result."

One other question must be given consideration and that is that even if it be considered that the circumstances were such that the plaintiff was, for the purposes of making the repair in the steam pipe, acting under the direction and control of the defendant, The Schweizer-Dipple Company as an employee, there could be no common law liability against the defendant employer, The Schweizer-Dipple Company because of §1465-70 GC of the Workmen's Compensation Act.

The ground upon which the trial court entered judgment upon defendants' motions at the conclusion of the taking of the plaintiff's evidence was that as a matter of law the plaintiff was guilty of contributory negligence.

When plaintiff and his fellow-worker arrived at the scene the the break in the steam line which he was sent to assist in repairing, the ground was covered with water and a great deal of steam was coming out of the ground. The evidence clearly shows that the plaintiff discussed this situation as he found it with his fellow-worker and his fellow-worker testified that he knew there were certain dangers connected with digging the dirt away from the broken steam line.

It is unquestioned therefore that the circumstances as thus disclosed being uncontradicted, left no question to be determined by the jury, requiring only the application of rules of law to determine the question whether or not plaintiff was guilty of contributory negligence assuming of course that there was (1) a duty established upon defendant The Schweizer-Dipple Company, to protect the plaintiff and (2) that there was a violation of such duty. The court, therefore, was correct in its conclusion that plaintiff's own evidence established his negligence which in all events would preclude recovery.

For the foregoing reasons the judgment should be affirmed.